UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE AHOLD DELHAIZE USA SERVICES DATA BREACH LITIGATION<br><br>This document relates to: All Actions | Civil Action No. 1:25-cv-00531<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Steven Banville, Nancy Benson, Autumn Canfield, Margaretanna Hart, Alisha Hawkins, Clifton Holloway, William Marshall, and John Henry Townsend Jr. (collectively, the "Plaintiffs"), by and through their undersigned counsel, file this Consolidated Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant Ahold Delhaize USA Services, LLC ("Ahold Delhaize USA Services," or "Defendant"). Plaintiffs allege the following based on personal knowledge, information and belief, and the investigation of counsel.

## I. NATURE OF THE ACTION

1. This action arises from Defendant's failure to secure the sensitive, valuable, and confidential personal information of its current and former employees, including Plaintiffs and Class Members, and its decision to wait nearly seven months to notify those persons that their information was compromised in a cyberattack by a notorious ransomware cybercriminal gang who then published that highly sensitive information on the Dark Web.

2. Defendant is a subsidiary of Ahold Delhaize USA that provides support services relating to human relations and employment matters to Ahold Delhaize USA and its subsidiaries, including: Food Lion, Giant Food, The GIANT Company, Hannaford, Stop & Shop, ADUSA Distribution, ADUSA Transportation and many other current and former subsidiaries and affiliates.

3. In that capacity, Defendant for decades has directly and indirectly collected highly sensitive personally identifiable information ("PII") such as names, addresses, telephone numbers, email addresses, dates of birth, Social Security numbers, government-issued identification numbers, protected health information ("PHI") such as worker's compensation records, disability records, and other health-related information contained in employment records, as well as financial account information and other non-public employment records (collectively "Sensitive Private Information") from millions of current and former employees. As a condition of employment, Plaintiffs and Class Members—current and former employees of Ahold Delhaize USA and its wholly-owned subsidiaries—were required to entrust Defendant with a vast array of such Sensitive Private Information.

4. Taking reasonable, standard precautions against cybercrime and data breaches is a fundamental part of doing business in the modern age—especially for businesses that must collect and store highly confidential information like the Sensitive Private Information at issue here.

5. By collecting and maintaining Plaintiffs' and the Class Members' Sensitive Private Information, Defendant was required by law to exercise reasonable care and comply with industry and statutory requirements to protect that information. Indeed, Defendant's global parent company Ahold Delhaize's Privacy Policy stated that: "The protection of personal data is paramount to Ahold Delhaize. Customers, associates, and business partners entrust our businesses with their personal data and we are committed to safeguarding this information."[1]

6. Despite this promise and its legal obligations to safeguard the Sensitive Private Information entrusted to it, Defendant implemented inadequate data security measures and allowed the information of millions of current and former employees to be stolen and sold on the Dark Web by a notorious cybercriminal organization.

7. Between November 5 and 6, 2024, a cybercriminal gang known as INC Ransom infiltrated Defendant's computer systems, accessed and exfiltrated file repositories that contained Plaintiffs' and Class Members' Sensitive Private Information, and later published the stolen data on the Dark Web (the "Data Breach").

8. The Data Breach was a direct, foreseeable, or even likely result of Defendant's deficient cybersecurity practices. The wealth of publicly available information and industry warnings regarding ransomware attacks makes Defendant's failures all the more egregious. Defendant disregarded the rights of Plaintiffs and Class Members by

---

[1] *Data Privacy*, Ahold Delhaize, https://aholddelhaize.com/about/technology-innovation/data-privacy (last visited Mar. 4, 2026).

failing to implement proper and reasonable measures to safeguard the Sensitive Private Information in its custody, and by failing to take the available and necessary steps to prevent the unauthorized disclosure of that information.

9. While Defendant's breach of its duties led to the Data Breach, it is Plaintiffs and other victims of the Data Breach that will bear the burden for years to come. The exponential cost to Plaintiffs and the Class Members resulting from the Data Breach cannot be overstated. Criminals can use victims' names, birth dates, social security numbers, and addresses to open new financial accounts, rack up fraudulent charges, obtain government benefits and IDs, fabricate identities, and file fraudulent tax returns well before the person whose Sensitive Private Information was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim—causing years of damage to their credit scores, financial stability, and personal security.

10. The Dark Web disclosure of information like the Sensitive Private Information here also puts Plaintiffs and Class Members at an imminent risk of future identity theft or healthcare and financial fraud. Malicious actors will often wait months, or even years, to use stolen PII to lower changes of detection by the victim or avoid temporary credit monitoring assistance. This means that Plaintiffs and the Class could be victims of multiple instances of identity theft as a result of this single Data Breach. While Plaintiffs and Class Members are already at an imminent risk for identity theft, such risk will continue, possibly indefinitely, as a direct and foreseeable result of Defendant's negligence.

11. The risks facing Plaintiffs and the Class Members were maximized by Defendant's delay in notifying them of the disclosure of their Sensitive Private Information. Despite detecting the Data Breach on November 6, 2024, and despite evidence the stolen data had been placed on the Dark Web, Defendant did not begin notifying Plaintiffs and Class Members until June 26, 2025—more than seven months after the breach occurred. This unreasonable delay prevented Plaintiffs and Class Members from taking timely defensive measures to protect their Sensitive Private Information and mitigate their injuries, especially because employees of Ahold Delhaize USA and its subsidiaries may not have known that Defendant held their Sensitive Private Information.

12. Adding insult to injury, Defendant has offered no assurance that former employees' data in its systems—some of which is over two decades old—has been secured or destroyed consistent with usual data retention policies that require the destruction of unused or unneeded data.

13. Through this lawsuit, Plaintiffs seek to hold Defendant responsible for the injuries it inflicted on Plaintiffs and over two million similarly situated individuals due to its impermissibly inadequate data security measures, and to obtain injunctive relief requiring, among other things, the implementation of security measures sufficient to protect the Sensitive Private Information that remains in Defendant's custody and control. Such injuries include: (i) lost value of Sensitive Private Information, a form of property that Defendant obtained from Plaintiffs and Class Members; (ii) out-of-pocket expenses associated with preventing, detecting, and remediating identity theft, social engineering,

and other unauthorized use of their Sensitive Private Information; (iii) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) the continued, long term, and certain risk that unauthorized persons will access and abuse Plaintiffs' and Class Members' Sensitive Private Information that is available on the Dark Web; (v) the continued and certain increased risk that the Sensitive Private Information that remains in Defendant's possession is subject to further unauthorized disclosure for so long as Defendant fails to undertake proper measures to protect it; (vi) theft of their Sensitive Private Information and the resulting loss of privacy rights in that information; (vii) credit freezes and unfreezes; (viii) decreased credit scores; (ix) lost work time; and (x) anxiety, annoyance, and nuisance.

14. Accordingly, Plaintiffs bring this action on behalf of themselves and the proposed Class for, among other things, negligence, negligence *per se*, breach of implied contract, violation of state consumer protection statutes, and declaratory and injunctive relief.

## II. <u>PARTIES</u>

15. Plaintiffs bring this action on behalf of themselves and all others similarly situated.

16. Plaintiff Steven Banville is an adult natural person and a former employee of Food Lion, an Ahold Delhaize USA subsidiary or affiliate, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with his employment. Plaintiff Banville resides in Pennsylvania where he intends to remain.

17. Plaintiff Nancy Benson is an adult natural person and a former employee of Hannaford, an Ahold Delhaize USA subsidiary or affiliate, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with her employment. Plaintiff Benson resides in New Hampshire where she intends to remain.

18. Plaintiff Autumn Canfield is an adult natural person and a former employee of Food Lion, an Ahold Delhaize USA subsidiary or affiliate, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with her employment. Plaintiff Canfield resides in Virginia where she intends to remain.

19. Plaintiff Margaretanna Hart is an adult natural person and a former employee of Hannaford, an Ahold Delhaize USA subsidiary or affiliate, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with her employment. Plaintiff Hart resides in New York where she intends to remain.

20. Plaintiff Alisha Hawkins is an adult natural person and a former employee of Food Lion f/k/a Harvey's, an Ahold Delhaize USA subsidiary or affiliate, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with her employment. Plaintiff Hawkins resides in Tennessee where she intends to remain.

21. Plaintiff Clifton Holloway is an adult natural person and a former employee of Food Lion, an Ahold Delhaize USA subsidiary or affiliate, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with his employment. Plaintiff Holloway resides in Georgia where he intends to remain.

22. Plaintiff William Marshall is an adult natural person and a former employee of Hannaford, an Ahold Delhaize USA subsidiary or affiliate, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with his employment. Plaintiff Marshall resides in Maine where he intends to remain.

23. Plaintiff John Henry Townsend Jr. is an adult natural person and a former employee of Food Lion and of Stop & Shop, Ahold Delhaize USA subsidiaries or affiliates, whose Sensitive Private Information was collected, stored, and maintained by Defendant in connection with his employment. Plaintiff Townsend resides in North Carolina where he intends to remain.

24. Defendant Ahold Delhaize USA Services, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Salisbury, North Carolina.[2]

## III. <u>JURISDICTION AND VENUE</u>

25. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because several Plaintiffs and at least one member of the Class, as defined below, are citizens of a different state than

---

[2] When subject matter jurisdiction is premised on the Class Action Fairness Act, an LLC's citizenship is based on the location of its principal place of business and the State of its incorporation. *See* 28 U.S.C. § 1332(d)(10) (stating that for purposes of CAFA jurisdiction, an unincorporated association deemed to be citizen of State where it has its principal place of business and under whose laws it is organized); *Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 700 (4th Cir. 2010).

Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

26. Defendant is subject to personal jurisdiction in North Carolina because it maintains its principal place of business here, conducts substantial business here, and the acts and omissions giving rise to Plaintiffs' claims occurred, in substantial part, in this District.

27. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant resides in this District, maintains its principal place of business in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District, including Defendant's collection, storage, and maintenance of Sensitive Private Information; the failure to implement reasonable data security measures; the operation and oversight of the systems compromised in the Data Breach; and Defendant's decisions regarding breach detection, investigation, and notification.

## IV. FACTUAL BACKGROUND

### A. Defendant Affirmatively Collected, Stored, and Retained Plaintiffs' and Class Members' Sensitive Private Information.

28. Ahold Delhaize USA is the largest grocery retail group on the United States East Coast, with over 2,000 stores across five separate grocery chains—Food Lion, Giant Food, The GIANT Company, Hannaford, and Stop & Shop, as well as other subsidiaries. Ahold Delhaize USA earns over $58 billion in annual sales.[3]

[3] *About Us*, Ahold Delhaize USA, https://www.adusa.com/about-us (last visited Mar. 4, 2026).

29. During all applicable times, Defendant provided human resources and employment services (including information technology, benefits and payroll services) to Ahold Delhaize USA, its grocery chains, and other subsidiaries., Defendant collected, maintained, and controlled the non-public Sensitive Private Information of millions of current and former employees of Ahold Delhaize USA and its subsidiaries, as well as the Sensitive Private Information of those employees' dependents. This information included names, addresses, telephone numbers, email addresses, dates of birth, Social Security numbers, government-issued identification numbers, financial account information, employment-related records, and PHI including workers' compensation, disability, and other health-related information contained in employment records.

30. As a result, Defendant amassed and retained extraordinarily sensitive and valuable personal data over long periods of time, including data that far exceeded what was necessary for ongoing employment or business purposes. For instance, Defendant held employment records that were over twenty years old, far longer than recommended for industry-standard data retention and destruction policies. As will be discussed in greater detail below, this alone creates an unacceptable and unjustifiable risk of cyberattack.

31. Plaintiffs and Class Members are individuals who entrusted and, in fact, were required to provide, their Sensitive Private Information to Defendant and its affiliates in the course of their employment. Plaintiffs and the Class reasonably expected that Defendant would secure their Sensitive Private Information. They had good reason for their expectation—Ahold promised to do so.

32. In its privacy policy, Ahold Delhaize—the Netherlands-based global parent company—acknowledged the importance of safeguarding individuals' Sensitive Private Information, representing that: "The protection of personal data is paramount to Ahold Delhaize. Customers, associates, and business partners entrust our businesses with their personal data and we are committed to safeguarding this information."[4]

33. In its *Code of Ethics*, Ahold Delhaize also represented that "[t]rust is critical to our business. We depend on trust of our Associates, customers, and the vendors and suppliers with whom we do business." As part of maintaining this trust, Ahold claimed to "protect the privacy and security of personal data belonging to our Associates, our customers and others with whom we do business."[5]

34. By collecting and storing Plaintiffs' and Class Members' Sensitive Private Information, Defendant assumed equitable and legal duties to implement adequate data security measures to protect and safeguard Plaintiffs' and Class Members' information from unauthorized access and disclosure. Defendant was the only entity capable of securing the data in its possession against a foreseeable data breach, and Plaintiffs and the Class were entirely reliant on Defendant to protect their Sensitive Private Information.

35. Defendant, however, breached these duties by implementing inadequate data security measures, creating a foreseeable risk of harm to Plaintiffs and the Class that

---

[4] *Data Privacy*, Ahold Delhaize, https://aholddelhaize.com/about/technology-innovation/data-privacy (last visited Mar. 4, 2026).
[5] *Code of Ethics*, Ahold Delhaize, https://media.aholddelhaize.com/media/jsalcgbz/ad-code-of-ethics-english.pdf (last visited Mar. 4, 2026).

materialized during the Data Breach, and further resulting in the access and exfiltration of Plaintiffs' and Class Members' Sensitive Private Information by cybercriminals who posted the data on the Dark Web.

**B. Defendant Knew the Risks of Collecting and Storing Sensitive Private Information.**

36. At all relevant times, Defendant knew it was collecting and storing employees' Sensitive Private Information and other PII, and, that as a result, its systems would be attractive targets for cybercriminals.

37. Sensitive Private Information—particularly the wide array of employment-related information that Defendant collected, stored, and retained—has significant value on the criminal black market, including on the Dark Web, particularly in data sets containing all of the necessary building blocks to commit a variety of fraudulent schemes and identity theft. And once exposed, this information cannot be made private again.

38. Numerous sources cite Dark Web pricing for stolen identity credentials. For example, a single victim's personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $30 to $4,255.[6] Unfortunately, law enforcement has difficulty policing Dark Web activity due to encryption that permits sellers and purchasers to conceal their identity.

---

[6] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs; *see also*, *Here's What Your Data Sells for on the Dark Web*, Experian (Jun. 30, 2025), *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

39. While the disclosure of compilations of Sensitive Personal Information are undoubtedly harmful, even the disclosure and misuse of discrete pieces of information—especially unique government identification numbers like Social Security, passport and driver's license numbers that cannot be easily replaced—can cause significant harm. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the impacted victim, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

40. For example, the Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for an identity theft victim:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you

to get credit.[7]

41. Because government identification numbers like Social Security numbers cannot be easily or quickly changed, victims of identity theft from data breaches often face multiple incidents of fraud over their lifetime due to the reuses of stolen data, and "may not find out that someone is using [their] [Social Security number] until [they]'re turned down for credit, or [they] begin to get calls from unknown creditors demanding payment for items [they] never bought,"[8] which highlights the long-term harms caused by the breach of such sensitive data.

42. Government agencies thus consider Social Security Numbers to be so sensitive as to warrant special considerations to ensure their security, regardless of whether they are maintained as "stand-alone [data] [or] when associated with any other identifiable information[.]"[9] The Government likewise recognizes that even partial Social Security numbers must be protected, because loss of "[t]he full or partial SSN can increase the risk of identity theft or fraud (i.e., access to bank accounts, driving records, tax and employment histories, and other private information[.]" To minimize the increase in risk of identity theft or fraud, the National Institutes of Health recommends the following measures:

a. Collect SSN as a primary identifier only if permitted by law;

---

[7] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[8] *Identity Theft and Your Social Security Number*, Social Security Administration (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[9] *See, e.g.*, *Frequently Asked Questions (FAQ)*, U.S. Dep't of Commerce, Office of Privacy and Open Government, https://www.commerce.gov/opog/frequently-asked-questions-faq (last visited Mar. 4, 2026).

b. Reduce and/or eliminate the use of SSNs not required for a business purpose;

c. Use an alternate identifier (unique, randomly generated number not derived from Sensitive Private Information);

d. Transmit SSN electronically only through an encrypted means.[10]

43. Even if cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of stolen information to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

44. The development of "Fullz" packages means stolen information from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers is not included in the Sensitive Private Information stolen in a specific incident, criminals can easily create a "Fullz" package that links that information together and sell the package at a higher price.

45. Importantly, once a cybercriminal has a "Fullz" package, cybercriminals can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity

---

[10] *The Privacy Pulse*, U.S. Nat'l Inst. Health (June 21, 2013), https://oma.od.nih.gov/forms/Privacy%20Documents/Privacy%20Newsletters/2013/Privacy%20Pulse%20-%20June%202013%20SSN.pdf; *see also*, https://www.dhs.gov/sites/default/files/publications/dhs%20policy%20directive%20047-01-007%20handbook%20for%20safeguarding%20sensitive%20PII%2012-4-2017.pdf.

fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[11] Most problematic, however, is that cybercriminals in possession of a "Fullz" package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication methods."[12]

46. PHI is also highly valuable and has been referred to as a "treasure trove for criminals."[13] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[14]

47. Cyber criminals seek out PHI at greater rates than other sources of personal information. In a 2025 report, the healthcare compliance company Bluesight found that there were 1,160 medical data breaches in 2024 with over 305 million patient records exposed.[15]

---

[11] Paige Tester, *What Are Fullz? How Hackers & Fraudsters Obtain & Use Fullz*, DataDome (Dec. 18, 2025), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work.

[12] *Protection Against Fullz and Fraud, Integrity*, Aristotle (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

[13] *See* Andrew Steger, *What Happens to Stolen Healthcare Data*, Healthtech Mag. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[14] *Id.*

[15] *See* Bluesight, *2025 Breach Barometer*, https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf (last visited Mar. 4, 2026).

48. According to a report released by the Federal Bureau of Investigation's (FBI) Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[16]

49. In addition, criminals can use stolen PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[17] Further, "[t]raditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[18]

50. Just like "Fullz" dossiers of PII are desirable to cybercriminals, stolen PII and PHI also are highly valuable because they enable cybercriminals to conduct targeted "phishing" or "spearphishing" attacks.

51. Phishing attacks are fraudulent communications—typically emails, text messages, or phone calls—designed to deceive recipients into revealing sensitive information such as login information, financial account numbers, or other highly sensitive information. These attacks often impersonate trusted institutions, including banks,

---

[16] *See* Steger, *supra* n.13.
[17] *Id.*
[18] Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) Info. Sys. Rsch. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

government agencies, and (most relevant here) current and former employers, and have become increasingly sophisticated in their ability to appear legitimate.[19]

52. Spearphishing is a targeted and particularly dangerous variant of phishing in which attackers use personal information about a victim—such as their name, address, employment information, Social Security number, government identification numbers, or other details—to craft highly personalized and convincing fraudulent messages. Unlike generic phishing attacks sent to mass audiences, spearphishing messages are tailored to the specific individual, dramatically increasing the likelihood that the recipient will be deceived. Information held by an employer is particularly valuable for malicious actors to use to construct such targeted attacks.[20]

53. Cybersecurity researchers and law enforcement agencies, including the FBI and the Cybersecurity and Infrastructure Security Agency (CISA), have repeatedly documented the connection between data breaches and subsequent phishing campaigns targeting affected individuals. For example, in the aftermath of the National Public Data breach in 2024, Microsoft warned consumers that the data breach created a "high likelihood" of phishing attacks using the information stolen in that breach.[21]

---

[19] *Spoofing and Phishing*, FBI, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/spoofing-and-phishing (last visited Mar. 4, 2026).
[20] *Spear Phishing vs. Phishing: What's the Difference?*, Analyst1 (Oct. 12, 2023), https://analyst1.com/spear-phishing-vs-phishing/
[21] *National Public Data breach: What you need to know*, Microsoft, https://support.microsoft.com/en-us/topic/national-public-data-breach-what-you-need-to-know-843686f7-06e2-4e91-8a3f-ae30b7213535 (last visited Mar. 4, 2026).

54. Aside from these risks of identity theft, fraud, and phishing or spearphishing attacks, PII is also property that has monetary value to data breach victims.

55. While the economic value of individual data was leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use, market exchanges have sprung up where individual users like Plaintiffs can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay users for their data.[22] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[23]

56. There are numerous examples of this kind of market, which is growing more robust as information asymmetries are diminished when users discover how their data is being covertly intercepted, collected, used, and disclosed.

57. According to an essay published by the Centre for International Governance Innovation:

> The social and economic importance of personal data is well understood. Personal data — typically defined as "information about an identifiable individual" — is central to a person's identity and can reveal intimate details about them. For businesses and governments that collect personal data, this information is often necessary to provide goods or services to specific individuals. However, personal data can also be used in the design and creation of goods or services. For example, such data can be used to create profiles or to drive targeted

---

[22] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[23] Jacob Kastrenakes, *A new TikTok Clone hit the top of the App Store by paying users to watch videos*, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktokclone-pay-watch-videos-kuaishou-bytedance-rival.

> advertisements. Personal data is used in massive quantities to train artificial intelligence (AI) systems; it is also important to a variety of research activities.[24]

58. In other words, a successful cyberattack leaves criminals with a lucrative and readily monetized supply of Sensitive Private Information—and deprives its victims of the exclusive use of their own information.

59. The value of this information has led to a marked increase in the number of data breaches in the United States.

60. In 2023, the year preceding Defendant's Data Breach, the number of reported data breaches in the United States increased by 78%.[25] Likewise, a study reported in 2025 that analyzed individual file records from past ransomware data breach incidents found that human resources data appeared in 81.7% of the breaches.[26]

61. Defendant knew or should have known that the Sensitive Private Information it collected and retained—including Social Security numbers, driver's license numbers, financial account information, employment records, and Protected Health Information relating to claims for disability, medical leave, and worker's compensation—was highly sensitive and of significant value to cybercriminals, as this information is routinely bought,

---

[24] Teresa Scassa, *Different Perspectives on Notions of Value The shifting Value of Personal Data* (Nov. 12, 2024), https://www.cigionline.org/articles/the-shifting-value-of-personal-data/ (last visited Mar. 4, 2026).

[25] Beth Maundrill, *Data Privacy Week: US Data Breaches Surge, 2023 Sees 78% Increase in Compromises*, Infosecurity Mag. (Jan. 23, 2024); https://www.infosecurity-magazine.com/news/us-data-breaches-surge-2023/

[26] Dana Weidinger, *When Employees Become the Target: HR Data in 82% of Breaches*, Assoc. of Strategic Ed. (Aug. 5, 2025), http://aseonline.org/News-Events/Articles/when-employees-become-the-target-hr-data-in-82-of-breaches (last visited Feb. 26, 2026).

sold, and exploited on criminal marketplaces, including on the Dark Web, where it can be used to commit identity theft, financial fraud, medical identity theft, tax fraud, and other crimes.

62. Likewise, the documented increase in cyberattacks, combined with increasing monetary incentives that heighten the risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant, at the time of the Data Breach. For example, INC Ransom—the cybercriminal gang behind the Data Breach—emerged as a well-known threat actor more than a year prior to the breach, in July 2023, and by the beginning of 2024 had already publicly announced twelve significant breaches that it has successfully perpetrated.[27]

63. Defendant was therefore on notice of the risk of cyberattack and misuse of data in its custody well before the Data Breach. Highly publicized ransomware attacks and data breaches involving similarly situated entities had already demonstrated that centralized repositories of employee and health-related data are prime targets for cybercriminals seeking to exfiltrate and monetize sensitive information.

64. Plaintiffs and Class Members, as current and former employees of Defendant or its subsidiaries, relied on Defendant to keep their Sensitive Private Information

---

[27] *Inc. Ransom Group: Detection and Prevention*, Check Point, https://www.checkpoint.com/cyber-hub/threat-prevention/ransomware/inc-ransom-group-detection-and-prevention/ (last visited Mar. 4, 2026). *See also* Josh Allman et al., *Investigating New INC Ransom Group Activity*, Huntress (Aug. 11, 2023), https://www.huntress.com/blog/investigating-new-inc-ransom-group-activity; Justin Timothy, *GRIT Ransomware Report: August 2023*, Guidepoint Security (Sept. 14, 2023), https://www.guidepointsecurity.com/blog/grit-ransomware-report-august-2023/.

confidential and secure, to use their information for business purposes only, to delete their information when it was no longer reasonably necessary to retain, and to make only authorized disclosures of their information.

65. By obtaining, collecting, and storing Plaintiffs' and Class Members' Sensitive Private Information, Ahold Delhaize USA assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiffs' and Class Members' Sensitive Private Information from foreseeable risks of disclosure to unauthorized parties. Defendant agreed to and undertook legal duties to securely store and maintain the Sensitive Private Information of Plaintiffs and Class Members.

66. Indeed, as demonstrated by the foregoing, Defendant's collection, storage, and retention of Sensitive Private Information created a foreseeable and substantial risk of precisely the type of harm suffered by Plaintiffs and Class Members, including loss of control over their personal information, increased risk of identity theft and fraud, actual misuse of their personal information, and the need for ongoing mitigation measures.

### C. Ahold Failed to Protect that Sensitive Private Information, resulting in the Data Breach.

67. On November 6, 2024, Defendant discovered that unauthorized actors had gained access to Defendant's internal U.S. business systems. Following an investigation, Defendant confirmed in no uncertain terms that the unauthorized actors had gained access

to and "obtained certain files from one of our internal U.S. file repositories between November 5 and 6, 2024."[28]

68. In data breach notification letters, Defendant described the Data Breach as follows:

> We detected a cybersecurity issue involving unauthorized access to some of our internal U.S. business systems on November 6, 2024. We immediately launched an investigation with the assistance of leading external cybersecurity experts, coordinated with U.S. federal law enforcement and began taking steps to contain the issue. Based on our investigation, we identified that an unauthorized third party obtained certain files from one of our internal U.S. file repositories between November 5 and 6, 2024.
>
> These investigations are complex and time intensive, and we have been working diligently to review the impacted files to understand their nature and scope, including to determine if, and to what extent, the information of individuals was affected. Based on this review, we recently learned that some of these files may have included internal employment records containing personal information about you that we obtained in the course of providing services for certain current and former Ahold Delhaize USA companies.

69. Defendant further acknowledged that the stolen file repository included the Sensitive Private Information of current and former employees of Defendant's subsidiaries, including Food Lion, Giant Food, The GIANT Company, Hannaford, Stop & Shop, ADUSA Distribution, ADUSA, and others, including names, contact information (for example, postal and email addresses and telephone numbers), dates of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health

---

[28] *Update on Cybersecurity Issue*, Ahold Delhaize USA Servs., https://www.adusaservices.com/#faq (last visited Mar. 4, 2026).

information (for example, workers' compensation information and medical information contained in employment records), and employment-related information.

70. However, following the Data Breach, on April 16, 2025, the notorious ransomware group known as "INC Ransom" claimed responsibility for the attack. INC Ransom took responsibility via a post on their Dark Web leak site, claiming to have stolen 6 terabytes of data from Ahold Delhaize USA and threatened to release the information if their ransom demands were not met.[29]

71. As proof, the cybercriminals leaked documents stolen from Defendant's computer systems on the Dark Web.[30]

72. After no ransom was paid, INC ultimately followed through with its threat and posted the stolen data on the Dark Web, as is its known modus operandi.[31] Consequently, cybercriminals across the globe now have access to Plaintiffs' and the Class's Sensitive Private Information and can weaponize that data for fraud and identity theft.

---

[29] David Jones et al., *Ahold Delhaize confirms data stolen after threat group claims credit for November attack*, Cybersecurity Dive (Apr. 17, 2025), https://www.cybersecuritydive.com/news/ahold-delhaize-confirms-data-stolen-after-threat-group-claims-credit-for-no/745715/.

[30] Sergiu Gatlan, *Retail giant Ahold Delhaize says data breach affects 2.2 million people*, Bleeping Computer, https://www.bleepingcomputer.com/news/security/retail-giant-ahold-delhaize-says-data-breach-affects-22-million-people/.

[31] *See* Blackpoint Cyber, *INC Ransom Ransomware* (Nov. 20, 2025), https://blackpointcyber.com/threat-profile/inc-ransom-ransomware/; Graham Cluley, *INC ransomware: what you need to know*, Fortra (Sep. 24, 2025), https://www.fortra.com/blog/inc-ransomware-what-need-know.

73. Given Defendant's and INC's statements and representations to date, the Data Breach was a targeted attack designed to acquire the Sensitive Private Information of Plaintiffs and Class Members and the cybercriminals were successful in that endeavor.

74. Despite the Data Breach occurring in November 2024, and INC Ransom posting about the Data Breach on the Dark Web as early as April 2025, Defendant waited until June 26, 2025, to begin notifying impacted individuals that their Sensitive Private Information had been exfiltrated from Defendant's computer systems.

75. On June 26, 2025, Defendant also reported to at least one state's Attorney General's office that the Data Breach impacted approximately 2,242,521 individuals.[32]

### D. The Data Breach and the Resulting Harm Was Entirely Foreseeable and Defendant Failed to Protect Against It or to Minimize Its Impact.

76. The risk of a data breach was well known and foreseeable to Defendant. As set forth *supra*, Sensitive Private Information of the type Defendant maintained is a prime target for cybercriminals, and ransomware attacks against large employers and centralized human-resources systems were widespread and escalating well before the November 2024 intrusion.

77. By way of example, in December 2021, Ultimate Kronos Group, a leading provider of workforce management solutions, was impacted by a breach that exposed the information of approximately 8 million employees, including employees from major

---

[32] *Data Breach Notifications,* Maine Att'y Gen., https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/b17963fc-3806-430e-b28e-bac47eb73a8b.html (last visited Mar. 4, 2026).

organizations such as FedEx, PepsiCo, Whole Foods, and public entities like the New York Metropolitan Transportation Authority and the City of Cleveland.[33]

78. Indeed, a recent review of 141 million individual files records sourced from 1,297 ransomware and data breach incidents revealed that Human Resources data have appeared in 82% of data breach incidents.[34]

79. Despite this known risk, Defendant failed to implement reasonable cybersecurity safeguards appropriate to the nature and scope of the data it collected and retained.

80. Cybersecurity firms and federal agencies have promulgated a series of best practices that should be implemented by companies that handle or facilitate the handling of personal information like that Defendant collected and kept, including, at minimum: establishing secure password and authentication procedures for employees; building secure networks by setting up network protection tools like firewalls and constantly monitoring for and patching vulnerabilities; monitoring active and inactive IP addresses, whitelisting software, and monitoring suspicious traffic on their networks; encrypting sensitive data using robust encryption algorithms; limiting access to data to only relevant staff; and

---

[33] Timework, *Case Study: The 2021 Kronos Randomware Attack and its Aftermath*, https://www.timeworksolutionsgroup.com/case-studies/case-study-the-2021-kronos-ransomware-attack-and-its-aftermath (last visited Mar. 2, 2026).

[34] Dexter Tilo, *HR data found in 82% of data breaches, analysis reveals*, Human Resources Director (July 23, 2025), https://www.hcamag.com/us/specialization/hr-technology/hr-data-found-in-82-of-data-breaches-analysis-reveals/543618.

properly training staff regarding password hygiene, phishing attacks, and social engineering attacks.[35]

81. The FTC has issued numerous guides for business outlining reasonable data and cyber security practices to diminish data breaches and the resulting harm to consumers and financial institutions, which it believes should be factored into all business decision-making.[36]

82. The FTC's 2016 publication *Protecting Personal Information: A Guide for Business*—which the agency re-endorsed in October 2023—established guidelines for fundamental data and cyber security principles and practices for business.[37] The guidelines note businesses should, among other best practices:

a. Protect the personal customer and consumer information that they keep;

b. Properly dispose of personal information that is no longer needed;

---

[35] *Customer Data Security: Best Practices for Data Privacy*, CDP, https://cdp.com/articles/customer-data-security-best-practices/; NIST, *Special Publication 800-122: Guide to Protecting the Confidentiality of Personally Identifiable Information*, https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf

[36] *Start with Security: A Guide for Business* at 2, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[37] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business. *See also Start with Security: A Guide for Business*, FTC (October 2023) (reiterating the principles underlying *Protecting Personal Information: A Guide for Business* and acknowledging "[t]hreats to data may transform over time, but the fundamentals of sound security remain constant.")

c. Encrypt information stored on computer networks;

d. Understand their network's vulnerabilities; and

e. Implement policies to correct security problems.[38]

83. The guidelines further recommend that businesses implement an array of specific methods to protect their systems, such as:

a. Using an intrusion detection system to expose a breach as soon as it occurs;

b. Monitoring all incoming traffic for activity indicating someone is attempting to hack the system;

c. Watching for large amounts of data being transmitted from the system; and

d. Having a response plan ready in the event of a breach.[39]

84. For example, Defendant is prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' Sensitive Private Information is an "unfair practice" in violation of the FTC Act.

---

[38] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business.

[39] *Id.*

85. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer and consumer data, including employee and human resources data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. While Defendant is prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce," Defendant nonetheless failed to implement reasonable and appropriate security measures to protect against unauthorized access to its employees confidential Sensitive Private Information.

86. Further, the National Institute of Standards in Technology ("NIST") publishes specific recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[40] Defendant failed to adhere to NIST guidance.

87. For example, NIST recommends that, to prevent security breaches through phishing attacks, companies should: require employees to practice regular exercises in no-notice social engineering attempts to collect information and gain unauthorized access to company systems; educate employees on the adverse impact of opening malicious email attachments; provide literacy training on recognizing and reporting potential and actual

---

[40] *Security and Privacy Controls for Information Systems and Organizations*, https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf (last visited Mar. 4, 2026).

instances of social engineering and social mining; and monitor emerging vulnerabilities (like new social engineering techniques) and implement procedures to mitigate the risks of those vulnerabilities.[41]

88. NIST further recommends that, to limit the impact of a data breach, organizations must dispose of information in its custody or control once it is no longer needed.[42]

89. Industry publications regularly reiterate similar guidance. For example, in reporting on the Data Breach, industry publications have emphasized that companies should deploy the following to defend against phishing and social engineering attacks: implement advanced email security platforms with phishing detection; conduct real-time URL and attachment scanning; hold regular cybersecurity awareness training for all employees; conduct simulated phishing campaigns to test readiness; implement Zero Trust network architecture; and implement endpoint detection and response (EDR) systems.[43] A human resources organization also noted a "foundational principle" of best cybersecurity practices includes not collecting and storing more data than is needed to fulfill a legitimate business purpose.[44]

---

[41] *Id.* at 60-61.
[42] *Id.* at 352.
[43] *See, e.g.*, Gary Miliefsky, *The Ahold Delhaize USA Breach: How a Single Click Can Cost Millions*, Cyber Defense (June 29, 2025), https://www.cyberdefensemagazine.com/the-ahold-delhaize-usa-breach-how-a-single-click-can-cost-millions/.
[44] Roy Mauer, *HR's Role in Protecting Employee Data,* Soc. for Human Resource Mgmt. (Jan. 8, 2025), https://www.shrm.org/topics-tools/flagships/all-things-work/hr-role-protecting-employee-data-people-analytics.

90. Defendant also has obligations created by additional laws, regulations, contracts, industry standards, and common law to maintain reasonable and appropriate physical, administrative, and technical measures to protect Plaintiffs' and Class Members' PII from unauthorized access and disclosure.

91. For example, at least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain PII to implement and maintain "reasonable security procedures and practices" and to protect Sensitive Private Information from unauthorized access.

92. Upon information and belief, Defendant implemented inadequate security measures and failed to comply with industry standards to prevent social engineering and ransomware attacks, specifically by:

a. failing to adequately train employees on phishing attacks, social engineering attacks, and ransomware attacks;

b. failing to conduct simulated phishing campaigns to test readiness;

c. failing to implement procedures to mitigate the risk of social engineering and ransomware attacks;

d. failing to implement advanced email security platforms with phishing detection;

e. failing to conduct real-time URL and attachment scanning;

f. failing to implement Zero Trust network architecture;

g. failing to implement endpoint detection and response (EDR) systems;

h. failing to adequately monitor its systems for suspicious activity;

i. failing to adequately encrypt or otherwise secure Sensitive Personal Information in its custody;

j. failing to detect unauthorized access in a timely manner; and

k. failing to promptly contain the intrusion once it occurred.

93. Defendant also failed to implement reasonable and appropriate data minimization and retention practices, particularly for the type of data it chose to collect and keep. Defendant retained vast quantities of Sensitive Private Information—including data relating to former employees and historical employment records—long after such information was reasonably necessary for legitimate business purposes, thereby increasing the scope and severity of the Data Breach.

94. Reasonable data security measures—such as network segmentation, access controls, employee training, encryption of sensitive data, intrusion-detection systems, advanced email security platforms with phishing detection, and regular vulnerability testing—were available, widely adopted in Defendant's industry, and necessary to protect the Sensitive Private Information entrusted to Defendant.

95. Defendant also failed to implement industry-standard data retention policies, greatly exacerbating the scope of the breach.

96. The FTC advises companies, "If you don't have a legitimate business need for sensitive personally identifying information, don't keep it. In fact, don't even collect it.

If you have a legitimate business need for the information, keep it only as long as it's necessary . . . . if it's not in your system, it can't be stolen by hackers."[45]

97. Experts broadly recognize, retaining data beyond absolutely necessary expands the attack surface, making it easier for cybercriminals to exploit vulnerabilities.

98. In this case, Defendant retained data for *decades* beyond what was necessary, violating well-established data retention best practices.

99. Defendant failed to implement or properly maintain these reasonable measures, despite representing that it would safeguard employees' personal and health-related information and despite its obligations under applicable laws, regulations, and industry standards.

100. As a direct and proximate result of Defendant's data security failures, unauthorized actors were able to access Defendant's systems, exfiltrate Sensitive Private Information, and publish that information on the Dark Web, causing the injuries alleged herein.

**E. The Data Breach Put Plaintiffs and Class Members at Imminent Risk of Fraud, Identity Theft, and other Cybercrimes.**

101. Defendant's failure to keep Plaintiffs' and Class Members' Sensitive Private Information secure has severe ramifications.

---

[45] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Mar. 4, 2026).

102. Given the nature of the Sensitive Private Information stolen in the Data Breach, hackers can commit identity theft, financial fraud, healthcare fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future.

103. Plaintiffs have already suffered injury, including misuse of the information stolen in the Data Breach, and face an imminent and substantial risk of further injury including identity theft and fraud and related cybercrimes due to the Data Breach.

104. Plaintiffs' and Class Members' Sensitive Private Information from the Data Breach is already circulating on the "Dark Web." The pervasive fraud experienced by Plaintiffs and Class Members, as set forth above, indicates that Plaintiffs' and Class Members' information is already circulating for sale on the Dark Web.

105. Criminal law also recognizes the value of Sensitive Private Information by imposing harsh prison sentences for those who steal this data. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Sensitive Private Information by: (1) demanding a ransom or blackmail payment for its destruction, (2) using Sensitive Private Information to commit fraud or identity theft, or (3) selling Sensitive Private Information to other cybercriminals on the black market and on the Dark Web.

106. Once cybercriminals start committing fraud and other identity theft-related crimes using a victim's Sensitive Private Information, the disruption to the victim's life can be catastrophic. A study by the Identity Theft Resource Center ("ITRC") found that,

among individuals who experienced fraudulent use of their Sensitive Private Information, nearly all of them had experienced some form of costs or other harm in their lives, including having to borrow money, being forced out of their home or residence, and being unable to care for their family.[46]

107. Further, although the theft of Sensitive Private Information creates an imminent risk of becoming a victim of identity theft and fraud, malicious actors often wait months or years to use the PII obtained in data breaches. GAO determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[47] During this delay, victims often become complacent and less diligent in monitoring their accounts after a significant period has passed.

108. Cybercriminals will also re-use stolen Sensitive Private Information, meaning individuals can be the victim of several cybercrimes stemming from a single data breach. Moreover, although elements of some Plaintiffs' and Class Members' data may have been compromised in other data breaches, the fact that the Data Breach centralizes the Sensitive Private Information and identifies the victims as current and former

---

[46] Identity Theft Resource Center, *Identity Theft Resource Center 2025 Consumer Impact* Report (October 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/10/The-2025-ITRC-Consumer-Impact-Report.pdf at 16.

[47] U.S. Gov't Accountability Off., GAO-07-737, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 42 (June 2007), available at https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm.

employees of Ahold Delhaize USA and its subsidiaries materially increases the risk to Plaintiffs and the Class.

109. Beyond all of the injuries described, events like the Data Breach also have a deep psychological impact on their victims:

> In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread. Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack. While expected, these emotions can paralyze you […].[48]

**F. Defendant's Failure to Provide Timely Notice Further Harmed Plaintiffs and Class Members.**

110. Defendant had an independent and ongoing duty to timely notify Plaintiffs and Class Members of the Data Breach and the unauthorized access to their Sensitive Private Information so that they could take prompt steps to protect themselves from identity theft, financial fraud, and other misuse.

111. Despite discovering the Data Breach in or around early November 2024, Defendant failed to provide notice to affected individuals for several months. Defendant did not begin issuing notice until approximately June 2025—7 months after the intrusion occurred.

112. This delay violated Defendant's obligations, as well as generally accepted principles of reasonable data security and incident response.

---

[48] Amber Steel, *The Psychological Impact of Cyber Attacks*, LastPass (Aug. 17, 2022), https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks.

113. During the prolonged delay between the Data Breach and Defendant's notification, Plaintiffs and Class Members were left unaware that their Sensitive Private Information—including Social Security numbers, financial information, employment records, and PHI—had been compromised.

114. Defendant's failure to provide timely notice deprived Plaintiffs and Class Members of the opportunity to take early and effective measures to mitigate harm, such as freezing credit, placing fraud alerts, monitoring financial and medical accounts, and securing personal records.

## V. PLAINTIFFS' EXPERIENCES

### A. Plaintiff Banville's Experience

115. Plaintiff Banville is a former employee of Food Lion, an Ahold Delhaize USA subsidiary or affiliate, who provided Sensitive Private Information to Defendant as a condition of his employment.

116. Plaintiff Banville's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Banville received a notice letter from Ahold Delhaize on or about August 2025, informing him of the Data Breach and the exposure of his PII. The notice letter informed Plaintiff Banville that his name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information

contained in employment records), and employment-related information were potentially compromised in the Data Breach.

117. Plaintiff Banville took reasonable steps to protect the privacy and security of his Sensitive Private Information and did not knowingly expose such information through unsafe practices. Plaintiff Banville stores documents containing Sensitive Private Information in safe and secure locations.

118. Plaintiff Banville would not have entrusted his information with his employer and Ahold Delhaize if he knew of Defendant's deficient data security practices. Plaintiff Banville only allowed Ahold Delhaize to collect, maintain, store, and use his Sensitive Private Information because he reasonably expected that Defendant would use basic security measures to protect his information and prevent its access by unauthorized third parties.

119. At the time of the breach, Plaintiff Banville was not notified and was unaware that his information had been compromised.

120. Upon information and belief, Plaintiff Banville's Sensitive Private Information has already been stolen and misused. Plaintiff Banville's Sensitive Private Information was found on the Dark Web in a posting on CreditWise. Plaintiff Banville has also experienced incidents of fraud and identity theft. Specifically, Plaintiff Banville has experienced: fraudulent inquiries on his credit report, attempted fraudulent ACH transfers and withdrawals from his bank account on or around September 2025, fraudulent charges on his debit and credit cards on or around October 2025, a fraudulent attempt to sign up for

car insurance and a Sirius radio account using his Sensitive Private Information, and a fraudulent attempt to apply for a job using his Sensitive Private Information, and an increase in spam messages. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Banville's life.

121. As a result of the Data Breach, Plaintiff Banville has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Banville has spent approximately 40 to 50 hours researching the Data Breach, checking his credit report for fraudulent or incorrect information, contacting his bank to report fraudulent activity, and communicating with his bank to get new debit and credit cards issued. Plaintiff Banville will be required to maintain this heightened vigilance and incur significant time and effort well into the future.

122. As a result of the Data Breach, Plaintiff Banville has suffered anxiety, stress, and emotional distress arising from the loss of control over his Sensitive Private Information and the ongoing risk of misuse.

123. Plaintiff Banville has a continuing interest in ensuring that his Sensitive Private Information, which, upon information and belief, remains in Ahold Delhaize USA's possession, is protected and safeguarded from future breaches.

**B. Plaintiff Benson's Experience**

124. Plaintiff Benson is a former employee of Hannaford, an Ahold Delhaize USA subsidiary or affiliate, who provided Sensitive Private Information to Defendant as a condition of her employment.

125. Plaintiff Benson's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Benson received a notice letter from Ahold Delhaize USA on or about June 26, 2025, informing her of the Data Breach and the exposure of her PII. The notice letter informed Plaintiff Benson that her name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information were potentially compromised in the Data Breach.

126. Plaintiff Benson took reasonable steps to protect the privacy and security of her Sensitive Private Information and did not knowingly expose such information through unsafe practices. Plaintiff Benson stores documents containing Sensitive Private Information in safe and secure locations.

127. Plaintiff Benson would not have entrusted her information with her employer and Ahold Delhaize USA if she knew of Defendant's deficient data security practices. Plaintiff Benson only allowed Ahold Delhaize USA to collect, maintain, store, and use her Sensitive Private Information because she reasonably expected that Defendant would use basic security measures to protect her information and prevent its access by unauthorized third parties.

128. At the time of the breach, Plaintiff Benson was not notified and was unaware that her information had been compromised.

129. Upon information and belief, Plaintiff Benson's Sensitive Private Information has already been stolen and misused. Plaintiff Benson has experienced a significant uptick in spam calls and texts using her Sensitive private information since the Data Breach occurred. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Benson's life.

130. As a result of the Data Breach, Plaintiff Benson has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Benson has already spent approximately 24 hours researching the breach, monitoring her accounts for suspicious activity, reviewing spam to determine which messages are legitimate and which are spam, and other necessary mitigation efforts.

131. Plaintiff Benson will be required to spend significant out-of-pocket resources to respond to the Data Breach and guard against identity theft and fraud, as recommended by Defendant. Plaintiff Benson will be required to maintain this heightened vigilance and incur the expense of these mitigation measures well into the future.

132. As a result of the Data Breach, Plaintiff Benson has suffered anxiety, stress, and emotional distress arising from the loss of control over her Sensitive Private Information and the ongoing risk of misuse.

133. Plaintiff Benson has a continuing interest in ensuring that her Sensitive Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**C. Plaintiff Canfield's Experience**

134. Plaintiff Canfield is a former employee of Food Lion, an Ahold Delhaize USA subsidiary or affiliate, who provided Sensitive Private Information to Defendant as a condition of her employment.

135. Plaintiff Canfield's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Canfield received a notice letter from Ahold Delhaize on or about July 2025, informing her of the Data Breach and the exposure of her PII. The notice letter informed Plaintiff Canfield that her name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information were potentially compromised in the Data Breach.

136. Plaintiff Canfield took reasonable steps to protect the privacy and security of her Sensitive Private Information and did not knowingly expose such information through unsafe practices. Plaintiff Canfield stores documents containing Sensitive Private Information in safe and secure locations.

137. Plaintiff Canfield would not have entrusted her information with her employer and Ahold Delhaize if she knew of Defendant's deficient data security practices. Plaintiff Canfield only allowed Ahold Delhaize USA to maintain, store, and use her Sensitive Private Information because she reasonably expected that Defendant would use basic security measures to protect her information and prevent its access by unauthorized third parties.

138. At the time of the breach, Plaintiff Canfield was not notified and was unaware that her information had been compromised.

139. Upon information and belief, Plaintiff Canfield's Sensitive Private Information has already been stolen and misused. Plaintiff Canfield has experienced incidents of fraud and identity theft. Specifically, Plaintiff Canfield experienced attempted fraudulent charges on her bank account on or around January 2026. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Canfield's life.

140. As a result of the Data Breach, Plaintiff Canfield has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Canfield has already spent approximately 8 hours researching the Data Breach, monitoring her accounts for suspicious activity, investigating fraudulent activity, and contacting her bank about suspicious or fraudulent activity. Plaintiff Canfield will be required to maintain this heightened vigilance and incur significant time and effort well into the future.

141. As a result of the Data Breach, Plaintiff Canfield has suffered anxiety, stress, and emotional distress arising from the loss of control over her Sensitive Private Information and the ongoing risk of misuse.

142. Plaintiff Canfield has a continuing interest in ensuring that her Sensitive Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**D. Plaintiff Hart's Experience**

143. Plaintiff Hart is a former employee of Hannaford, an Ahold Delhaize USA subsidiary or affiliate, who provided Sensitive Private Information to Defendant as a condition of her employment.

144. Plaintiff Hart's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Hart received a notice letter from Ahold Delhaize USA sometime between the end of June and early July informing her of the Data Breach and the exposure of her PII. The notice letter informed Plaintiff Hart that her name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information were potentially compromised in the Data Breach.

145. Plaintiff Hart took reasonable steps to protect the privacy and security of her Sensitive Private Information and did not knowingly expose such information through unsafe practices. Plaintiff Hart stores documents containing Sensitive Private Information in safe and secure locations.

146. Plaintiff Hart would not have entrusted her information with her employer and Ahold Delhaize USA if she knew of Defendant's deficient data security practices. Plaintiff Hart only allowed Ahold Delhaize USA to collect, maintain, store, and use her Sensitive Private Information because she reasonably expected that Defendant would use basic security measures to protect her information and prevent its access by unauthorized third parties.

147. At the time of the breach, Plaintiff Hart was not notified and was unaware that her information had been compromised.

148. Upon information and belief, Plaintiff Hart's Sensitive Private Information has already been stolen and misused. Plaintiff Hart was informed that her Private Information was found on the Dark Web from Credit Karma. Plaintiff Hart has also experienced incidents of fraud and identity theft. Specifically, Plaintiff Hart has experienced: unauthorized debit card charges in April, June, and August 2025; three attempted unauthorized withdrawals of $1,000 each; a rise in spam calls; and an increase in spam text messages from collection agencies containing her Private Information. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Hart's life.

149. As a result of the Data Breach, Plaintiff Hart has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Hart has already spent approximately 24 hours researching the Data Breach, contacting credit bureaus to freeze credit, contacting her bank to get new debit cards issued, monitoring her bank accounts for suspicious activity, and responding to the attempted fraudulent activities on her debit account.

150. Plaintiff Hart has also spent—and will continue to spend—significant out-of-pocket resources to respond to the Data Breach and guard against identity theft and fraud, as recommended by Defendant. Plaintiff Hart has already spent or incurred approximately $324 as part of these efforts, including: $300 in overdraft fees, $24 annually for phone spam risk protection, in addition to four round-trip visits to the bank, each approximately one mile. Plaintiff Hart will be required to maintain this heightened vigilance and incur the expense of these mitigation measures well into the future.

151. As a result of the Data Breach, Plaintiff Hart has suffered anxiety, stress, and emotional distress arising from the loss of control over her Sensitive Private Information and the ongoing risk of misuse.

152. Plaintiff Hart has a continuing interest in ensuring that her Sensitive Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## E. Plaintiff Hawkins' Experience

153. Plaintiff Hawkins is a former employee of Harvey's Supermarkets, a former Ahold Delhaize USA subsidiary or affiliate and former sister retail chain of Food Lion, who provided Sensitive Private Information to Defendant as a condition of her employment.

154. Plaintiff Hawkins's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Hawkins received a notice letter from Ahold Delhaize USA on or about July 1, 2025, informing her of the Data Breach and the exposure of her PII. The notice letter informed Plaintiff Hawkins that her name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information were potentially compromised in the Data Breach.

155. Plaintiff Hawkins took reasonable steps to protect the privacy and security of her Sensitive Private Information and did not knowingly expose such information through unsafe practices. Plaintiff Hawkins stores documents containing Sensitive Private Information in safe and secure locations.

156. Plaintiff Hawkins would not have entrusted her information with her employer and Ahold Delhaize if she knew of Defendant's deficient data security practices.

Plaintiff Hawkins only allowed Ahold Delhaize USA to collect, maintain, store, and use her Sensitive Private Information because she reasonably expected that Defendant would use basic security measures to protect her information and prevent its access by unauthorized third parties.

157. At the time of the breach, Plaintiff Hawkins was not notified and was unaware that her information had been compromised.

158. Upon information and belief, Plaintiff Hawkins Sensitive Private Information has already been stolen and misused. Plaintiff Hawkins Sensitive Private Information was found on the Dark Web. Plaintiff Hawkins has also experienced incidents of fraud and identity theft. Specifically, Plaintiff Hawkins has experienced unauthorized credit card charges, new bank accounts opened, and decreased credit score reports. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Hawkins life.

159. As a result of the Data Breach, Plaintiff Hawkins has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Hawkins has already spent approximately 40 hours researching the data breach, contacting her attorneys, gathering additional information about her past employment with Ahold Delhaize USA and its subsidiaries, contacting the credit bureau to protect her information, freezing her bank and credit card accounts, enrolling in credit monitoring services, and continuously check her accounts for an fraudulent or out of the ordinary transactions.

160. Plaintiff Hawkins has also spent—and will continue to spend—significant out-of-pocket resources to respond to the Data Breach and guard against identity theft and fraud, as recommended by Defendant. Plaintiff Hawkins has already spent approximately $360 as part of these efforts, including monthly fees for Norton360, a security system that protects devices from viruses and includes identity theft protection and Dark Web monitoring. Plaintiff Hawkins will be required to maintain this heightened vigilance and incur the potential expenses of these mitigation measures well into the future.

161. As a result of the Data Breach, Plaintiff Hawkins has suffered anxiety, stress, and emotional distress arising from the loss of control over her Sensitive Private Information and the ongoing risk of misuse.

162. Plaintiff Hawkins has a continuing interest in ensuring that her Sensitive Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**F. Plaintiff Holloway's Experience**

163. Plaintiff Holloway is a former employee of Food Lion, an Ahold Delhaize USA subsidiary or affiliate, who provided Sensitive Private Information to Defendant as a condition of her employment.

164. Plaintiff Holloway's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Holloway received a notice letter from Ahold Delhaize USA on or about July 7, 2025, informing him of the Data Breach and the exposure of his PII. The notice letter informed Plaintiff Holloway that his name, contact information

(for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information were potentially compromised in the Data Breach.

165. Plaintiff Holloway took reasonable steps to protect the privacy and security of his Sensitive Private Information and did not knowingly expose such information through unsafe practices. Plaintiff Holloway stores documents containing Sensitive Private Information in safe and secure locations.

166. Plaintiff Holloway would not have entrusted his information with his employer and Ahold Delhaize USA if he knew of Defendant's deficient data security practices. Plaintiff Holloway only allowed Ahold Delhaize USA to collect, maintain, store, and use his Sensitive Private Information because he reasonably expected that Defendant would use basic security measures to protect his information and prevent its access by unauthorized third parties.

167. At the time of the breach, Plaintiff Holloway was not notified and was unaware that his information had been compromised.

168. Upon information and belief, Plaintiff Holloway's Sensitive Private Information has already been stolen and misused. Plaintiff Holloway's has also experienced incidents of fraud and identity theft. Specifically, Plaintiff Holloway has

experienced an increased amount of spam calls. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Holloway's life.

169. As a result of the Data Breach, Plaintiff Holloway has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Holloway has already spent approximately 6 hours researching the breach, monitoring his accounts for fraudulent activity, enabling multi-factor authentication for his accounts, and responding to suspicious activity.

170. Plaintiff Holloway will be required to maintain this heightened vigilance and incur the expense of these mitigation measures well into the future.

171. As a result of the Data Breach, Plaintiff Holloway has suffered anxiety, stress, and emotional distress arising from the loss of control over his Sensitive Private Information and the ongoing risk of misuse.

172. Plaintiff Holloway has a continuing interest in ensuring that his Sensitive Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**G. Plaintiff Marshall's Experience**

173. Plaintiff Marshall is a former employee of Hannaford, an Ahold Delhaize USA subsidiary or affiliate, who provided Sensitive Private Information to Defendant as a condition of his employment.

174. Plaintiff Marshall's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Marshall received a notice letter from Ahold

Delhaize USA on or about June 30, 2025, informing him of the Data Breach and the exposure of his PII. The notice letter informed Plaintiff Marshall that his name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information were potentially compromised in the Data Breach.

175. Plaintiff Marshall took reasonable steps to protect the privacy and security of his Sensitive Private Information and did not knowingly expose such information through unsafe practices. Plaintiff Marshall stores documents containing Sensitive Private Information in safe and secure locations.

176. Plaintiff Marshall would not have entrusted his information with his employer and Ahold Delhaize USA if he knew of Defendant's deficient data security practices. Plaintiff Marshall only allowed Ahold Delhaize USA to collect, maintain, store, and use his Sensitive Private Information because he reasonably expected that Defendant would use basic security measures to protect his information and prevent its access by unauthorized third parties.

177. At the time of the breach, Plaintiff Marshall was not notified and was unaware that his information had been compromised.

178. Upon information and belief, Plaintiff Marshall's Sensitive Private Information has already been stolen and misused. Plaintiff Marshall's Sensitive Private Information was found on the Dark Web.

179. As a result of the Data Breach, Plaintiff Marshall has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Marshall has already spent approximately 30 hours researching the data breach, contacting his attorneys, securing his bank and credit accounts, enrolling in credit monitoring, and continuously checking to make sure there is no suspicious or fraudulent activity on his accounts.

180. Plaintiff Marshall has also spent—and will continue to spend—significant out-of-pocket resources to respond to the Data Breach and guard against identity theft and fraud, as recommended by Defendant. Plaintiff Marshall has already spent approximately $60 as part of these efforts, including fees for a subscription to Aura, a paid service that monitors his personal information, credit finances and active devices and alerts him regarding any suspicious activity. Plaintiff Marshall will be required to maintain this heightened vigilance and incur the potential expenses of these mitigation measures well into the future.

181. As a result of the Data Breach, Plaintiff Marshall has suffered anxiety, stress, and emotional distress arising from the loss of control over his Sensitive Private Information and the ongoing risk of misuse.

182. Plaintiff Marshall has a continuing interest in ensuring that his Sensitive Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

**H. Plaintiff Townsend's Experience**

183. Plaintiff Townsend is a former employee of both Food Lion and Stop & Shop, each of which is an Ahold Delhaize USA subsidiary or affiliate, who provided Sensitive Private Information to Defendant as a condition of his employment with both entities.

184. Plaintiff Townsend's Sensitive Private Information was accessed and exfiltrated in the Data Breach. Plaintiff Townsend received a notice letter from Ahold Delhaize USA on or about June 26, 2025, informing him of the Data Breach and the exposure of his PII. The notice letter informed Plaintiff Townsend that his name, contact information (for example, postal and email address and telephone number), date of birth, government-issued identification numbers (for example, Social Security, passport, and driver's license numbers), financial account information (for example, bank account number), health information (for example, workers' compensation information and medical information contained in employment records), and employment-related information were potentially compromised in the Data Breach.

185. Plaintiff Townsend took reasonable steps to protect the privacy and security of his Sensitive Private Information and did not knowingly expose such information

through unsafe practices. Plaintiff Townsend stores documents containing Sensitive Private Information in safe and secure locations.

186. Plaintiff Townsend would not have entrusted his information with his employer and Ahold Delhaize USA if he knew of Defendant's deficient data security practices. Plaintiff Townsend only allowed Ahold Delhaize USA to collect, maintain, store, and use his Sensitive Private Information because he reasonably expected that Defendant would use basic security measures to protect his information and prevent its access by unauthorized third parties.

187. At the time of the breach, Plaintiff Townsend was not notified and was unaware that his information had been compromised.

188. Upon information and belief, Plaintiff Townsend's Sensitive Private Information has already been stolen and misused. Plaintiff Townsend has experienced incidents of fraud and identity theft. Specifically, Plaintiff Townsend has experienced: multiple CapitalOne and Ally Bank notifications denying him credit that trace back to browsers in California, Montana, Nevada, and Nebraska, even though Plaintiff Townsend lives in North Carolina and did not apply for credit; a $700 fraudulent charge from Apple in the summer of 2025; a $600 fraudulent charge from a cellphone service provider he does not use; a lowered credit score in December of 2025 due to unpaid medical bills that were not his; about 15–20 daily spam calls and 3–4 daily spam text messages posturing as Apple Support, some of which use his PII; and several fraud alerts from Credit Karma. These

actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Townsend's life.

189. As a result of the Data Breach, Plaintiff Townsend has lost significant time and effort dealing with issues related to the Data Breach and its aftermath, as recommended by Defendant. Specifically, Plaintiff Townsend has already spent over 100 hours checking Credit Karma, deleting spam messages, checking bank notices, rectifying false charges and false credit reports due to fraudulent activity, investigating fraudulent/suspicious activity, contacting banks, credit card companies, and other vendors about fraudulent/suspicious activity, contacting card issuers/banks to preemptively get new numbers issued, and trying to manage his stress, which is exacerbated by preexisting stress due to Plaintiff Townsend's past military service.

190. Plaintiff Townsend has also spent—and will continue to spend—significant out-of-pocket resources to respond to the Data Breach and as a result of identity theft and fraud, as recommended and acknowledged by Defendant. Plaintiff Townsend has already lost approximately $3,000 to $4,000 as a result of the Data Breach, including money fraudulently withdrawn from his bank accounts and Cash App account. Plaintiff Townsend will be required to maintain this heightened vigilance and incur the expense of these mitigation measures and breach consequences well into the future.

191. As a result of the Data Breach, Plaintiff Townsend has suffered anxiety, stress, and emotional distress arising from the loss of control over his Sensitive Private

Information and the ongoing risk of misuse. He is concerned he will never recover from the fraud's negative impact his credit report.

192. Plaintiff Townsend is also currently trying to purchase a home is having difficulty doing so due to the impact that the Data Breach has had on his credit.

193. Plaintiff Townsend has a continuing interest in ensuring that his Sensitive Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## VI. CLASS ACTION ALLEGATIONS

194. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

### A. Class Definitions

195. Plaintiffs seek to represent the following Class:

> All persons residing in the United States whose Sensitive Private Information was accessed, exfiltrated, or otherwise compromised in the Ahold Delhaize USA Services data breach that occurred in or around November 2024 (the "Class").

196. Excluded from the Class are Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, employees, legal representatives, successors, and assigns; and the judicial officer assigned to this case and members of the judicial officer's immediate family.

197. Plaintiffs reserve the right to amend or modify the Class definition as discovery and further investigation reveal additional facts.

### B. Numerosity

198. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Data Breach compromised the Sensitive Private Information of approximately 2.2 million individuals.[49]

### C. Commonality

199. Questions of law and fact are common to the Class and predominate over questions affecting only individual members. Common questions include, but are not limited to:

a. Whether and to what extent Defendant had a duty to protect the Sensitive Private Information of Plaintiffs and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' Sensitive Private Information;

c. Whether Defendant had duties not to disclose the Sensitive Private Information of Plaintiffs and Class Members to unauthorized third parties;

d. Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' Sensitive Private Information;

e. Whether Defendant failed to adequately safeguard the Sensitive Private Information of Plaintiffs and Class Members;

---

[49] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/b17963fc-3806-430e-b28e-bac47eb73a8b.html (last visited Mar. 6, 2026).

f. Whether Defendant breached its duties to exercise reasonable care in handling Plaintiffs' and Class Members' Sensitive Private Information;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant failed to timely detect, contain, and investigate the Data Breach;

i. Whether Defendant failed to timely and adequately notify Plaintiffs and Class Members of the Data Breach;

j. Whether Defendant's acts and omissions caused Plaintiffs' and Class Members' injuries;

k. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of the Data Breach and Defendant's wrongful conduct; and

l. Whether Plaintiffs and Class Members are entitled to injunctive or equitable relief to, *inter alia*, redress the imminent and currently ongoing harm faced as a result of the Data Breach.

**D. Typicality**

200. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were subjected to the same Data Breach, had their Sensitive Private

Information compromised as a result of Defendant's uniform conduct, suffered similar injuries arising from Defendant's failures, and Plaintiffs' and Class Members' claims are premised on the same legal theories.

**E. Adequacy**

201. Plaintiffs will fairly and adequately protect the interests of the Class, because Plaintiffs' interests are not antagonistic to those of the Class that Plaintiffs seek to represent, and Plaintiffs are committed to vigorously prosecuting this action.

202. Plaintiffs have retained counsel that are competent and experienced in complex class action litigation, data breach cases, and consumer and privacy protection matters, have adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed, and are committed to adequately representing the interests of the Class.

**F. Predominance and Superiority—Rule 23(b)(3)**

203. Common questions of law and fact predominate over any questions affecting only individual members of the Class. Defendant engaged in a common course of conduct that gives rise to Plaintiffs' and Class Members' claims, and this litigation will turn on similar or identical violations, business practices, and injuries. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiffs and each member of the Class. If Defendant breached its duties and

failed to protect Plaintiffs' and Class Members' PII from theft and misuse, then Plaintiffs and each Class member suffered damages by that conduct.

204. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation or joinder of all Class Members would be impracticable and inefficient given the number of affected individuals and the common factual and legal issues presented. The proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

**G. Injunctive and Declaratory Relief—Rule 23(b)(2)**

205. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

206. As demonstrated by the Data Breach, Defendant has failed to implement and maintain reasonable administrative, technical, and physical safeguards to protect Plaintiffs' and Class Members' Sensitive Private Information, and has demonstrated an inability or unwillingness to do so absent judicial intervention.

207. Plaintiffs and Class Members therefore remain at a continuing and imminent risk of harm because their Sensitive Private Information remains in Defendant's

possession, custody, or control, and Defendant's systems have already been shown to be vulnerable to compromise.

208. Plaintiffs therefore seek injunctive relief requiring Defendant to implement reasonable and appropriate data security measures, improve breach detection and response protocols, limit the collection and retention of Sensitive Private Information to that which is reasonably necessary for legitimate business purposes and delete all data that is no longer reasonably necessary for Defendant to have in its possession, custody and control, provide appropriate data security training for employees, undergo periodic third-party security assessments, and comply with applicable data protection and notification obligations to prevent Plaintiffs' significant, imminent, and ongoing risk of future harm.

## VII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

209. Plaintiffs restate and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

210. Defendant owed Plaintiffs and Class Members a duty to exercise reasonable care in collecting, storing, maintaining, and safeguarding their Sensitive Private Information to prevent that information from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

211. Defendant's duty arose from Defendant's affirmative collection of Plaintiffs' and Class Members' Sensitive Private Information, exclusive possession and control of

that information, the foreseeability of harm from unauthorized access, Defendant's representations and practices regarding data security, and Defendant's obligations under applicable laws, regulations, and industry standards.

212. Defendant has full knowledge of the sensitivity and value of the Sensitive Private Information that it collected from Plaintiffs and Class Members, and the type of harm that Plaintiffs and Class Members would suffer if their Sensitive Private Information was stolen and/or wrongfully disclosed.

213. Defendant's duty to use reasonable care arose from several other sources, including but not limited to those alleged herein.

214. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiffs and Class Members, on the other hand. The special relationship arose because Plaintiffs and Class Members were required to provide their Sensitive Private Information to Defendant as a condition of their employment with Defendant or one of its subsidiaries. Only Defendant could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach because it had exclusive knowledge and control regarding same.

215. Defendant further had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. Defendant knew that it was collecting and maintaining highly sensitive information, that its computing

systems and data storage architecture were vulnerable to unauthorized access, and that Defendant's systems would be targeted hackers for the purpose of stealing and misusing the troves of highly valuable Sensitive Private Information that it collected, stored, and retained.

216. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

217. Defendant also had a duty to safeguard the Sensitive Private Information of Plaintiffs and Class Members and to promptly notify them of a breach under various state laws and statutes that require Defendant to reasonably safeguard sensitive Private Information, as detailed herein.

218. Defendant's duty to exercise reasonable care regarding Plaintiffs' and Class Members' Sensitive Private Information included, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiffs' and Class Members' personal information in Defendant's possession was adequately protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) properly training employees to prevent breaches of its systems; and (d) maintaining security measures consistent with industry standards, including regularly updating, patching, and evaluating security measures.

219. Defendant's duties extended to protecting Plaintiffs and the class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

220. Defendant also had a duty to provide timely, adequate notification of a data breach so that, among other things, Plaintiffs and Class Members could take appropriate measures to freeze or lock their credit profiles; avoid unauthorized charges on their credit or debit card accounts; monitor their account information and credit reports for fraudulent activity; contact their banks or other financial institutions that issue their credit or debit cards; obtain credit monitoring services; contact their health insurers or governmental health insurance providers; and take other steps to mitigate or ameliorate the damages caused by Defendant's misconduct. Defendant was the only entity that had sufficient knowledge to properly provide this notice.

221. Defendant breached the duties it owed to Plaintiffs and Class Members alleged above and, thus, was negligent in failing to do so. Defendant breached these duties by, among other things: (a) implementing inadequate security systems, protocols and practices that were insufficient to protect the Sensitive Private Information of Plaintiffs and Class Members; (b) failing to adequately monitor its systems for suspicious activity;

(c) failing to timely detect, investigate, and contain the Data Breach and other unauthorized activity on its system while it was ongoing; (d) implementing inadequate and unreasonable access controls, intrusion-detection, and data-protection measures; (e) implementing security systems that did not comply with industry standards; (f) failing to comply with regulations protecting the Sensitive Private Information at issue during the period of the Data Breach; (f) over-retaining Sensitive Private Information for longer than reasonably necessary; and (g) inadequately disclosing the Data Breach to Plaintiffs and Class Members in an unreasonably delayed manner.

222. Defendant's acts and omissions fell below the standard of care that an entity entrusted with Sensitive Private Information would reasonably exercise under similar circumstances.

223. As a direct and proximate result of Defendant's negligence, unauthorized actors accessed and exfiltrated Plaintiffs' and Class Members' Sensitive Private Information, causing the injuries and damages alleged herein.

224. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their Sensitive Information would not have been compromised.

225. Defendant's failure to take proper security measures to protect the Sensitive Private Information of Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiffs' and Class Members' Sensitive Private Information. As the entity collecting and storing Plaintiffs'

and Class Members' Sensitive Private Information, Defendant was in the best position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

226. Plaintiffs and Class Members were foreseeable victims of Defendant's inadequate data security practices, and it was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiffs and Class Members as alleged in this Complaint.

227. Defendant's negligence was therefore a substantial factor in causing Plaintiffs' and Class Members' injuries, and Plaintiffs' and Class Members' injuries are the direct and proximate result of Defendant's wrongful and negligent conduct.

228. Plaintiffs' and Class Members' injuries include: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, health insurance statements, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the

Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

229. Plaintiffs and Class Members seek all relief available under law, including compensatory and consequential damages, restitution, injunctive relief requiring Defendant to implement reasonable data security measures and compliance programs, and such other relief as the Court deems just and proper.

## COUNT II
## NEGLIGENCE *PER SE*
## (On Behalf of Plaintiffs and the Class)

230. Plaintiffs reallege and incorporate by reference the foregoing allegations, as if fully set forth herein.

231. Defendant owed a duty to Plaintiffs and Class Members to keep their Sensitive Private Information secure, arising under FTC Act.

232. Specifically, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to use reasonable measures to protect Sensitive Private Information. Various FTC publications and orders further form the basis of Defendant's duty.

233. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Sensitive Private Information and not complying with the industry

standards. Defendant's conduct was particularly unreasonable given the nature and amount of Sensitive Private Information it obtained and stored and the foreseeable consequences of a data breach involving the highly sensitive information that Defendant collected, stored, and maintained, including the damages that would result to Plaintiffs and Class Members.

234. Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

235. Defendant was further required to comply with numerous state data security and data breach notification statutes that impose specific duties to safeguard personal information and to provide timely notice of unauthorized access to such information, including N.C. Gen. Stat. Ann. § 75-65.

236. These state statutes were enacted to protect consumers and employees, including Plaintiffs and Class Members, from the exact type of harm that occurred here—namely, identity theft, financial fraud, medical identity theft, and the misuse of sensitive PII and PHI like the Sensitive Private Information at issue here.

237. Defendant's violations of Section 5 of the FTC Act as well as numerous state data security and data breach notification statutes constitute negligence *per se*.

238. Defendant violated its duties by, among other things, inadequate security systems, protocols and practices that were insufficient to protect the Sensitive Private Information of Plaintiffs and Class Members, and by failing to timely and adequately notify Plaintiffs and Class Members of the Data Breach.

239. Defendant's violations constitute negligence *per se* because Defendant violated laws designed to protect a specific class of persons—Plaintiffs and Class Members—from a particular type of harm that Defendant's conduct caused.

240. Plaintiffs and Class Members suffered injuries of the type the statutes were intended to prevent, including: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, health insurance statements, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

241. Defendant's violations of these statutes were a direct and proximate cause of Plaintiffs' and Class Members' injuries and damages.

242. As a result of Defendant's negligence *per se*, Plaintiffs and Class Members are entitled to all relief available under law, including compensatory and consequential damages, statutory damages where available, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

243. Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

244. Defendant became the guardian of Plaintiffs' and Class Members' Sensitive Private Information. Defendant became a fiduciary, created by its undertaking and guardianship of Plaintiffs' and Class Members' Sensitive Private Information, to act primarily for their benefit. This duty included the obligation to safeguard Plaintiffs' and Class Members' Sensitive Private Information and to timely detect and notify Plaintiffs and Class Members in the event of a data breach.

245. In order to provide Plaintiffs and Class Members employment benefits and compensation, or to even consider Plaintiffs and Class Members for employment, Defendant required that they provide their Sensitive Private Information.

246. Defendant knowingly undertook the responsibility and duties related to the possession of Plaintiffs' and Class Members' Sensitive Private Information in order to provide them with employment and employment benefits and compensation.

247. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matter within the scope of its relationship with them. Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by implementing security systems, protocols and practices that were insufficient and inadequate to protect the Sensitive Private Information of Plaintiffs and Class Members. Defendant further breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely detect the Data Breach and timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

248. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank

statements, credit card statements, financial account statements, credit reports, health insurance statements, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

249. Plaintiffs and Class Members seek all relief available under law, including compensatory and consequential damages, restitution, injunctive relief requiring Defendant to implement reasonable data security measures and compliance programs, and such other relief as the Court deems just and proper.

**COUNT IV**
**BAILMENT**
**(On Behalf of Plaintiffs and the Class)**

250. Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

251. Plaintiffs, Class Members, and Defendant contemplated a mutual benefit bailment when Plaintiffs and Class Members transmitted their Sensitive Private Information to Defendant solely for the purpose of obtaining employment.

252. Plaintiffs and Class Members entrusted their Sensitive Private Information to Defendant for a specific purpose—to obtain employment—with an implied contract that

the trust was to be faithfully executed, and the Sensitive Private Information was to be accounted for when the special purpose was accomplished.

253. Defendant accepted Plaintiffs' and Class Members' Sensitive Private Information for the specific purpose of employment.

254. Defendant was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiffs' and Class Members' Sensitive Private Information.

255. Plaintiffs' and Class Members' Sensitive Private Information was used for a different purpose than what Plaintiffs and the Class intended, for a longer time period than what was intended, and/or in a different manner or place than Plaintiffs and the Class intended.

256. Plaintiffs and Class Members were damaged as a result and are entitled to relief as set forth herein, including but not limited to the lost value of their Sensitive Private Information.

## COUNT V
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiffs and the Class)

257. Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

258. Plaintiffs and Class Members were required to provide Defendant with their Sensitive Private Information as a condition of their employment with Defendant and/or one of its subsidiaries.

259. In exchange, Defendant impliedly promised to protect Plaintiffs' and Class Members' Sensitive Private Information through adequate data security measures. Defendant specifically promised—either expressly through its policies and representations, or impliedly through its conduct—to take reasonable measures to safeguard Plaintiffs' and Class Members' Sensitive Private Information from unauthorized access, disclosure, and misuse.

260. Defendant therefore entered into implied contracts with Plaintiffs and Class Members by collecting, receiving, and retaining their Sensitive Private Information in exchange for providing employment-related services, including payroll, benefits administration, and human resources support.

261. Plaintiffs and Class Members reasonably relied on Defendant's representations, practices, and obligations concerning data security when they provided their Sensitive Private Information to Defendant as a condition of employment. Plaintiffs and Class Members would not have provided their Sensitive Private Information to Defendant—or would have taken additional steps to protect themselves—if Defendant had not represented or implied that it would safeguard such information.

262. A meeting of the minds therefore occurred when Plaintiffs and Class Members agreed to, and did, provide their Sensitive Private Information to Defendant in exchange for, amongst other things, the protection of such information.

263. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant and/or its subsidiaries.

264. Defendant, however, breached these implied contracts by: (a) failing to implement and maintain reasonable administrative, technical, and physical safeguards to protect Sensitive Private Information; and (b) failing to timely and adequately notify Plaintiffs and Class Members of the Data Breach.

265. Moreover, the covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

266. Defendant's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract.

267. As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiffs and Class Members suffered injuries and damages, including: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit

monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, health insurance statements, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

268. Plaintiffs and Class Members are entitled to all relief available under law for Defendant's breach of implied contract, including compensatory and consequential damages, nominal damages, restitution, equitable and injunctive relief, and such other relief as the Court deems just and proper.

## COUNT VI
## DECLARATORY JUDGMENT ACT
## 28 U.S.C. § 2201 *et seq.*
## (On Behalf of Plaintiffs and the Class)

269. Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

270. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts

that are tortious and violate the terms of the federal and state statutes described in this Complaint.

271. An actual and justiciable controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Sensitive Private Information and whether Defendant currently maintains data security measures and cyber-related policies adequate to protect Plaintiffs and Class Members from further data breaches that compromise their information. Plaintiffs allege that Defendant's data security measures remain inadequate and that Defendant remains in possession of Plaintiffs' and Class Members' Sensitive Private Information. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their information and remain at imminent risk that further compromises of their Sensitive Private Information will occur for as long as Defendant maintains inadequate data security measures.

272. In short, Defendant has failed to implement and maintain reasonable administrative, technical, and physical safeguards to protect Plaintiffs' and Class Members' Sensitive Private Information from the ongoing and imminent risk of future harm and has demonstrated an inability or unwillingness to do so absent judicial intervention.

273. Plaintiffs and Class Members remain at a continuing and imminent risk of harm because their Sensitive Private Information remains in Defendant's possession, custody, or control, and Defendant's systems have already been shown to be vulnerable to compromise.

274. Plaintiffs and Class Members lack an adequate remedy at law to fully redress the ongoing and future risks posed by Defendant's conduct, including the continued exposure and potential misuse of their Sensitive Private Information.

275. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, that: (a) Defendant owes a legal duty to secure Plaintiffs' and Class Members' Sensitive Private Information under the common law and Section 5 of the FTC Act; and (b) Defendant continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiffs' and Class Members' Sensitive Private Information.

276. This declaration will serve a useful purpose in clarifying the parties' legal rights and obligations.

277. Plaintiffs further seek corresponding injunctive relief requiring Defendant to take all reasonable and necessary measures to protect Sensitive Private Information and to employ adequate security protocols consistent with law and industry standards, including but not limited to:

a. Implementing and maintaining reasonable data security policies, procedures, and technical safeguards;

b. Improving monitoring, detection, and incident response capabilities;

c. Deleting all Sensitive Private Information that is no longer reasonably necessary for legitimate business purposes;

d. Implementing policies limiting the collection and retention of Sensitive Private Information to that which is reasonably necessary for legitimate business purposes;

e. Providing appropriate training to employees with access to Sensitive Private Information; and

f. Undergoing periodic third-party security assessments to ensure ongoing compliance with data security obligations.

278. Without declaratory and injunctive relief, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, due to the substantial and imminent risk of another data breach involving Defendant's systems. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct. In the meantime, Defendant will continue to benefit from and profit from its failure to adequately safeguard Sensitive Private Information.

279. The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, Defendant has pre-existing legal obligation to employ adequate data security measures, and the cost of implementing such measures is far outweighed by the potential cost to Plaintiffs and Class Members of another breach.

280. Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and others whose confidential information would be further compromised.

281. Accordingly, Plaintiffs and Class Members seek declaratory and injunctive relief as set forth herein, together with such other and further relief as the Court deems just and proper.

## COUNT VII
## NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
## N.C. Gen. Stat. § 75-1.1
## (On Behalf of Plaintiffs and the Class)

282. Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

283. Plaintiffs bring this claim on behalf of themselves and the entire Class.

284. The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") declares unlawful unfair or deceptive acts or practices in or affecting commerce. N.C. Gen. Stat. § 75-1.1(a).

285. Ahold Delhaize USA engaged in unfair or deceptive acts and practices in violation of the NCUDTPA by, among other things:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' Sensitive Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Sensitive Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Class Members' Sensitive Private Information, including by implementing and maintaining reasonable security measures and by deleting Sensitive Private Information that was no longer reasonably necessary for a legitimate business purpose;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Sensitive Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not properly secure Plaintiffs' and Class Members' Sensitive Private Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Sensitive Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

286. These acts and omissions had the tendency or capacity to deceive reasonable persons, including Plaintiffs and Class Members, regarding Defendant's data security practices and its ability to protect Sensitive Private Information.

287. Defendant's conduct occurred in or affected commerce, including Defendant's provision of centralized employment, payroll, benefits administration, data security, and human resources services to affiliated entities operating throughout North Carolina and the United States.

288. Plaintiffs and Class Members reasonably relied on Defendant's omissions and representations or were otherwise injured by Defendant's unfair and deceptive conduct, and could not have reasonably discovered the truth of Defendant's inadequate data security practices prior to the Data Breach.

289. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class Members suffered actual injury and ascertainable losses, including loss of control over their Sensitive Private Information, increased risk of identity theft and fraud, out-of-pocket mitigation costs, lost time, and diminution in the value of their Sensitive Private Information.

290. Defendant's violations of the NCUDTPA entitle Plaintiffs and Class Members to actual damages, treble damages, injunctive relief, attorneys' fees, and all other relief available under N.C. Gen. Stat. § 75-16.

**COUNT VIII**
**NORTH CAROLINA IDENTITY THEFT PROTECTION ACT**
**N.C. Gen. Stat. §§ 75-60 *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

291. Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

292. Plaintiffs bring this claim on behalf of themselves and the entire Class.

293. Ahold Delhaize USA is a business that owns or licenses computerized data that includes personal information, as defined by N.C. Gen. Stat. § 75- 61.

294. Ahold Delhaize USA is required to accurately notify Plaintiffs and Class Members if it discovers a security breach or receives notice of a security breach (where unencrypted and unredacted Private Information was accessed or acquired by unauthorized persons), without unreasonable delay under N.C. Gen. Stat. § 75-65.

295. Plaintiffs are consumers and individuals covered by the North Carolina Identity Theft Protection Act, as defined by N.C. Gen. Stat. § 75-61(2).

296. Plaintiffs' and Class Members' Sensitive Private Information constitutes "personal information" under N.C. Gen. Stat. § 75-61(10), as their information stolen in the Data Breach includes their unencrypted and unredacted names and government identification numbers (including Social Security numbers, passport numbers, and driver's

license numbers), which constitute "identifying information" under N.C. Gen. Stat. § 14-113.20.

297. Because Ahold Delhaize USA discovered a security breach and had notice of a security breach (where unencrypted and unredacted Private Information was accessed or acquired by unauthorized persons), Ahold Delhaize USA had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by N.C. Gen. Stat. § 75-65.

298. By failing to disclose the Data Breach in a timely and accurate manner, Ahold Delhaize USA violated N.C. Gen. Stat. § 75-65.

299. A violation of N.C. Gen. Stat. § 75-65 is an unlawful trade practice under N.C. Gen. Stat. Art. 2A § 75-1.1.

300. As a direct and proximate result of Defendant's violations of N.C. Gen. Stat. § 75-65, Plaintiffs and Class Members suffered damages, as described and alleged above.

301. Plaintiffs and Class Members seek relief under N.C. Gen. Stat. §§ 75-16 and 16.1, including treble damages and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court enter judgment in their favor and against Defendant, and grant the following relief:

A. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B. Declare that Defendant breached its duties to Plaintiffs and Class Members, and that Defendant's acts and omissions described herein violate Plaintiffs' and Class Members' legal rights;

C. Grant injunctive relief to prohibit Defendant from unlawfully retaining Plaintiffs' and the Class's Sensitive Private Information and continuing to engage in the unlawful acts, omissions, and practices described herein, and requiring Defendant to implement improved security procedures and measures, including, *inter alia*:

1. Requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of Plaintiffs' and Class Members' Sensitive Private Information;

2. Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

3. Requiring Defendant to adequately train employees on phishing attacks, social engineering attacks, and ransomware attacks;

4. Requiring Defendant to implement procedures to mitigate the risk of social engineering and ransomware attacks, including implementing advanced email security platforms with phishing detection, conducting real-time URL and attachment scanning,

implementing Zero Trust network architecture, and implementing endpoint detection and response (EDR) systems;

5. Requiring Defendant to routinely and continually conduct internal training and education, at least annually, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

6. Requiring Defendant to implement a system to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs and systems for protecting Sensitive Private Information; and

7. Requiring Defendant to implement, maintain, regularly review and revise as necessary, a threat management program designed to appropriately monitor information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

D. Award Plaintiffs and Class Members actual damages, compensatory damages, statutory damages (including treble damages), nominal damages, and statutory penalties, as allowable by law and in an amount to be determined;

E. Order restitution, disgorgement, and all other equitable monetary relief necessary to remedy Defendant's unjust enrichment;

F. Order Defendant to provide appropriate notice, remediation, and ongoing protective services reasonably necessary to mitigate future harm to Plaintiffs and Class Members whose Sensitive Private Information was compromised;

G. Award Plaintiffs and Class Members their reasonable attorneys' fees, costs, and expenses incurred in this action, as permitted by law, including awarding attorneys' fees, costs, and expenses under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-16;

H. Award pre-judgment and post-judgment interest as allowed by law;

I. Enter all other Orders, findings, and determinations identified and sought in this Complaint; and

J. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 4, 2026

Respectfully submitted,


/s/ E. Winslow Taylor
E. Winslow Taylor, Bar No. 45533
Daniel R. Taylor, Jr., Bar No. 7358
**TAYLOR & TAYLOR ATTORNEYS AT LAW, PLLC**
1080 W. Fourth St.
Winston-Salem, NC 27101
Telephone: (336) 418-7445
winslow@t2legal.com
dantaylor@t2legal.com

Gary F. Lynch (*special appearance*)
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
gary@lcllp.com

Brian C. Gudmundson (*special appearance*)
Michael L. Laird (*special appearance*)
Madison M. DeMaris (*special appearance*)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
madison.demaris@zimmreed.com

Sabita J. Soneji (*special appearance*)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Tel. 510-254-6808
ssoneji@tzlegal.com

*Attorneys for Plaintiffs and the Proposed Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2026, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ E. Winslow Taylor*
E. Winslow Taylor